IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
Tampa Division

| | | |
|---|---|---|
| U.S. Equal Employment Opportunity Commission, | ) ) | |
| Plaintiff, | ) | |
| v. | ) ) | Case No. 8:13-CV-2723-T-30TGW |
| St. Joseph's Hospital, Inc., | ) ) | |
| Defendant. | ) | |
| _____ | ) | |

## PLAINTIFF EEOC'S
## DISPOSITIVE MOTION FOR SUMMARY JUDGMENT

Plaintiff Equal Employment Opportunity Commission ("EEOC") moves for summary judgment on its claim that Defendant St. Joseph's Hospital, Inc. ("SJH") violated the Americans with Disabilities Act, 42 U.S.C. §12102, *et seq.* ("ADA"), as amended, when it failed to allow Leokadia Bryk's ("Bryk") continued use of a cane as a reasonable accommodation, resulting in   her termination. SJH asserts (somewhat ambiguously) as affirmative defenses that: (1) Bryk is not a qualified individual with a disability because "Bryk cannot demonstrate that she was able to perform the essential functions of the job of a clinical nurse II with our without reasonable accommodation," and (2) Bryk's cane would present "an undue hardship on the operation of the business." D.E. #8, p.5.

At the heart of this case is SJH's contention that Bryk was not "qualified" because her requested accommodation—her cane—might be taken and used as a weapon by a patient and, therefore, rendered her unable to *safely* perform the Clinical Nurse II ("CNII") position's essential functions. Whether analyzed through the applicable direct threat framework or reasonableness, the undisputed facts demonstrate that Bryk's cane did not present a significant safety risk and that any assertion otherwise was based on no more than subjective speculation and stereotype.

There is no genuine dispute as to Bryk's ability to *physically* perform the essential functions of the CNII position if permitted to continue to use a cane. The undisputed evidence also indicates that: (1) Bryk's stenosis was disabling; (2) Bryk provided notice of her medical-condition-linked need for a cane both explicitly in writing and constructively through her open use of a cane and impaired walking; and (3) absent her request to use a cane, Bryk would still be working at SJH as a CNII today.

Viewed in a light most favorable to SJH, the undisputed record facts reflect that Bryk was a qualified individual with a disability whose requested accommodation was reasonable and would have caused no undue hardship to SJH. Consequently, as a matter of law, SJH unlawfully failed to reasonably accommodate Bryk's disability.

## I.   UNDISPUTED MATERIAL FACTS[1]

**SJH's Behavioral Health Unit.** SJH is part of the BayCare Health System, a regional health system in central Florida. *Ryder* 5:9-25. Its psychiatric department, the Behavioral Health Unit ("BHU"), accepted, *inter alia*, patients committed under the Baker Act, Florida's involuntary commitment statute. *Ryder* 88:24-89:17. In 2011, SJH's BHU was located within the hospital itself and was comprised of three distinct units: (1) the "2 North B Unit," also known as the General Adult Psychiatric Unit or the "progressive unit"; (2) the Children's Psychiatric Unit, or "pediatric unit," located on the second floor; and (3) the Intensive Psychiatric Care Unit ("ITCU"), also known as the "intensive unit" or the "acute unit" unit, located on the third floor.[2]   *Hines* 7:17-8:15; *Maya* 8:11-8:20; *Grapes* 11:23-12:4; *Wright* 36:14-37:5. The acute unit contained the most ill patients—patients who were considered more emotionally volatile and prone to violence. *Hines* 8:7-8:15; *Maya* 8:11-8:20; *Whiting* 8:18-9:5; *Grapes* 68:10-68:16; *Martin* 7:12-7:23. By contrast, the progressive unit (2 North B) housed patients that were more stable and less volatile, agitated, suicidal or homicidal.

---

[1] EEOC incorporates by reference its Appendix of Exhibits in Support of its Motion for Summary Judgment and will refer to those Exhibits as "Pl.Ex. __." Deposition transcripts are identified by the last name of the deponent for ease of reference, *i.e.*, (*Bryk*, p.__,lines___).'

[2] In February, 2012, the BHU was moved into a freestanding behavioral health center in 2012. *Ryder* 97:7-24; *Wright* 31:23-32:5; *Grapes* 73:5-73:25; *Hines* 79:6-82:12; *Maya* 33:14-33:18. SJH has acknowledged that the patient population at the freestanding center was no more dangerous than that of the BHU located within SJH— indeed, other than those patients with certain serious medical, *non-psychiatric* conditions, the then-patients of the BHU were simply moved to the freestanding behavioral health center. *Grapes* 73:5-73:25; *Hines* 79:3-82:12; *Maya* 34:10-34:15.

*Hines* 8:7-15; *Maya* 8:11-20; *Grapes* 85:6-10; *Whiting* 8:18-9:5; *Martin* 7:12-7:23.

**Safety.** The BHU has specialized safety rules to protect patients and staff from harm. *See, e.g.,* Pl.Exs. 19; 20; 21; 25; 22 p. 002149 ("It is the goal of St. Joseph's Behavioral Health Center to insure the safety and dignity of all patients."); Pl.Ex. 17 pp. 5-6. "It is standard behavioral health policy and practice to prohibit patients from possessing certain highly dangerous items that are likely to cause harm to themselves, to other patients, visitors and/or hospital staff." Pl.Ex. 17 p.5. The BHU had a contraband policy that lists specific items prohibited in the unit, including weapons and other dangerous items. Pl.Ex. 20 p.000505. Numerous everyday items that theoretically *could* be used as weapons, but which are necessary to the functioning of the unit such as walkers, mops, brooms, pens, food trays, plastic utensils, and razors, were not on the list and were routinely permitted in the BHU and used by or near patients. *Id.*; *Hines* 44:1-20, 45:3-47:25; *Ryder* 115:16-116:5; *Whiting* 33:25-34:17; *Bryk* 95:17-98:25; *Maya* 44:16-47:25; Donnelly 66:14-67:13; *Martin* 29:15-35:19, 37:14-38:3 ; Pl.Ex. 20 p.000505**;** *Barnett* 118:6-119:8; Pl.Ex. 15, ¶ 17. Ambulatory devices, including canes, are also not on the prohibited item lists. Pl.Exs. 20 p.000505.

SJH further assures its patients that its staff has received aggression-management safety training, including non-abusive psychological and physical intervention ("NAPPI") techniques. Pl.Exs. 24 p.001256; 40. SJH records incidents of patient aggression on "Code Grey Incident" reports. *Wright* 151:2-151:8, 152:24-153:17; *Whiting* 36:11-36:14; *Sikes* 63:18-63:23. SJH has a safety committee that conducts monthly meetings in the BHU regarding safety issues, including Code Grey incidents. *Whiting* 36:15-37:23; *Sikes* 58:13-59:8, 64:7-21. Numerous SJH managers, including those with responsibility for BHU safety,

attended those meetings. *Sikes* 58:13-65:9; 125:8-13.

From 2009 to 2011, there were 27 Code Grey incidents involving the use of an object as a weapon by a patient. Pl.Ex. 34. None of the objects involved were taken from hospital staff. *Id*. All of the objects—including chairs, food trays, razors, and writing instruments— were items permitted in the BHU. Pl.Ex. 20 p.000505. Over this three-year period, only two incidents involving an object used as a weapon occurred in the 2 North B unit, and only one occurred during the day shift. Pl.Ex. 34. BHU Code Grey Incident reports for 2009-2011 reflect no incidents involving a cane, walker or other mobility assistive device. *Id.*

**Patient Use of Assistive Devices in the BHU.** The BHU inpatient admissions policy provided that patients who required canes could be admitted with physician approval.[3] Pl.Ex. 21, p.000493**.** The patient handbook for the freestanding successor to the BHU explicitly provides that, with physician approval, patients were permitted to use canes: "Medical equipment deemed necessary is permitted. For Example: electric wheelchairs, prescribed braces, *canes* and walkers." Pl.Ex. 24, p.001255 (emphasis added).[4] Patients in the Progressive Unit were commonly provided walkers. *Whiting* 26:21-27:4; *Maya* 24:24-25:8; *Grapes* 72:2-10**.** Falling was the greatest risk in the BHU. *McGee* 37:14-25; *see also http://www.floridahealthfinder.gov/reports-guides/patient-safety.aspx#Preventionof Falls*.

**Bryk's Nursing Career at SJH.** Bryk began working in the BHU in 1990, and has

---

[3] Specifically, the policy lists categories of patients who cannot be admitted to the BHU and, under the category "ambulation," notes: "Patients who cannot ambulate independently and without assistive devices (wheelchairs, crutches, *canes,* walkers), require bedside rails, adjustable beds, call beds or Geri-chairs - Exceptions *require physician approval."* Pl.Ex. 21, p.000493 (first emphasis added)).

[4] EEOC acknowledges that some SJH managers allege that in practice, patients were not given canes and were instead given walkers or wheelchairs. *See, e.g.*, *Whiting* 26:21-27:4; *Maya* 24:24-25:8; *Grapes* 72:2-10. Moreover, EEOC has been denied information regarding whether patients actually used canes. D.E. # 36 at 3-8; D.E. # 68 at 2; D.E. # 79 at 2.

worked as a Clinical Nurse II and III. Pl.Exs. 15, ¶¶ 2-7; 16. In addition to on-the-job training, Bryk received consistent formal safety training throughout her employment, including NAPPI training. Pl.Ex. 38. In the 2009-2011 period, Bryk worked as a Charge Nurse (Clinical Nurse III) on the 7 a.m. to 3 p.m. shift in the "progressive" or 2 North B Unit. *Grapes* 19:13-20:9. Pl.Ex. 15, ¶ 7. During this shift, patients spent the "vast majority" of the day in therapist-led group therapy or activity sessions. *Hines* 46:12-24; 72:14-23; Pl.Ex. 15, ¶ 16. As a CN II on this unit, Bryk would be responsible for medication distribution and documentation, among other duties. *Hines* 72:24-73:10; *see also id.* 64:9-71:20.

Bryk was able to physically perform all the job tasks required of the CNIII and CNII positions if permitted to use her cane. Pl.Ex.15 ¶ 29; *Hines* 64:9-71:20; *Maya* 59:8-66:13. There is no record evidence that Bryk was unable to perform *any* function of the CN II or III positions she held at any time. Bryk repeatedly received satisfactory performance evaluations, none of which mentioned or questioned her ability to physically or safely perform her job requirements. Pl.Ex. 30; *Maya* 64:7-65:10. No medical records were ever requested, and no evaluation or assessment of Bryk's ability to physically perform the requirements of the Clinical Nurse position was undertaken.[5] *See Sikes* 207:7-213:16; *McGee* 51:7-54:15; *Wright* 131:13-134:8, 160:8-168:12; *Ryder* 110:8-113:6.

**Bryk's Stenosis and Other Complicated Musculo-Skeletal Problems Required the Use of a Cane.** Bryk has "severe inoperable lumbar spinal stenosis and degenerative spondylosis, symptomatically dating back to 2006, gradual onset."[6] Pl.Ex. 17 p.7. In August

---

[5] Managers with concerns about an employee's ability to physically perform her job were supposed to initiate a physical evaluation by SJH's employee health department. *Martin* 95:4-96:1, 96:20-97:4.

[6] Spinal stenosis is the gradual narrowing of the spinal canal where the spinal cord and nerve roots are located. Pl.Ex. 17 p.6. Most commonly, and in Bryk's case, the condition is caused by degenerative arthritis of the spine,

2009, Bryk underwent hip surgery to correct the "severity of her right hip osteoarthritis […] Only after […] she had gone through a healing phase, including physical therapy, was the contribution of her lumbar spinal stenosis uncovered." Pl.Ex.17 p.7.

Bryk was cleared to and returned to work in September/October, 2009. Pl.Ex.15, ¶ 11. However, her stenosis continued to cause her pain and impair her ability to walk distances. Pl.Ex. 17 pp.7-8; *Bryk* 25:15-25, 26:16-28:12, 29:21-30:10, 57:4-18, 87:13-16; Pl.Ex. 15, ¶¶ 8-9. Consequently, Bryk used a lightweight cane with a wrist strap at work and at home to alleviate the pain and enable her to walk. *Bryk* 43:8-16; 51:18-52:3; Pl.Ex. 17 pp.7-8; *Maya* 17:12-19:3; *Grapes* 20:19-21:13; 23:2-13; Pl.Ex. 15, ¶ 10. Without her cane, Bryk's short- (and long-) distance walking was impaired, because "the pain was so intense [she] would have to stop" and wait for the pain to subside. *Bryk* 88:21-90:15; 91:6-17. Numerous managers acknowledge, at least since 2011, seeing Bryk with and/or being aware she was using a cane at work. *Wright* 98:2-17; *Ryder* 32:14-22; *Sikes* 146:2-147:6, 153:7-23, 154:24-155:10; *Maya* 17:12-17, 19:1-6; *Donnelly* 57:15-20; *Grapes* 20:19-21:13, 23:2-13; *Teeuwen* 38:5-23; *Martin* 19:16-20:14. BHU employees and supervisors acknowledge that Bryk's difficulty walking was obvious and she not only limped when walking even short distances, but was clearly in "great distress" when she walked without a cane. *Whiting* 15:7-16, 20:1-9; 38:3-24, 41:21:42-1; *Martin* 18:24-19:8. No manager told Bryk not to use a cane, reported her cane use as a safety issue to higher management, or raised it at any monthly BHU safety committee meeting. *Maya* 59:8-66:13; *Grapes* 23:2-26:5; 29:24-30:20; *Martin* 20:15-20:21;

---

known as spondylosis. *Id.* Lumbar Spinal Stenosis causes pain, and can eventually lead to spasms and/or loss of bladder or bowel control. *Id.* The symptoms of Lumbar Spinal Stenosis worsen with standing or walking. *Id.*p.7.

Sikes 58:13-59:8; Pl.Ex. 15, ¶ 24.

**SJH's Reasonable Accommodation Policy.** Since 1999, SJH has had a written policy setting forth the procedures to follow when an employee requests a reasonable accommodation. Pl.Ex. 25. According to this policy, "it is the obligation of any . . . Team Member to make known the need for a 'reasonable accommodation.'" *Id.* p.000485. Further, SJH managers "are not privileged to know the specific nature of the medical condition requiring the need for accommodation." *Id.* p.000488.

SJH's policy provides that, once a Team Member expresses a need for an accommodation, a meeting will be held and, "[i]f an accommodation appears unreasonable . . . an 'Interactive Process,' will commence to find alternative solutions." *Id.* p. 000487. The employee "will be asked to sign a release of information from their personal physician. A representative of Employee Health will review detailed information supplied by the . . . Team Members Primary Care Physician to determine the nature, reasons for and possible alternatives to the requested accommodation." *Id.*[7] Krista Sikes, SJH's human resources manager, is knowledgeable about the policy and the ADA.*Sikes*49:22-25,50:19-51:16,53:2-5.

**Bryk's Denied Accommodation Request.** In 2011, Debi Hines left her position as Nurse Manager of the BHU; Susan Wright began overseeing the BHU. *Hines* 6:11-7:4; *Wrigh*t 200:6-200:13; Pl.Ex. 31 p.2; *Wright* 28:9-30:3. At some point in 2011, Wright saw Bryk using her cane. Pl.Ex. 31; *Wright* 98:2-17. On Thursday, October 17, 2011, Wright and Sikes met with Bryk in order to: (1) discipline her, including a demotion to the CNII position, as a result of her admission that certain policy violations were common during an

---

[7]  Discussions during the Interactive Process "will be carefully documented." *Id.* p.000488.

accreditation survey; and (2) ask Bryk to fill out a Work Clearance Form. *Bryk* 156:16-157:6; *Sikes* 156:5-157:8, 162:20-163:4; Pl.Ex. 15, ¶¶ 18-19; Pl.Ex. 33. Bryk told Sikes when they met in September or October that she "needed to use her cane to ambulate." *Sikes* 146:10-147:6, 183:8-185:18, 186:9-23, 209:4-13, 211:22-213:16. Bryk was not asked about the specifics of her cane or cane usage and was not asked to sign a release for her medical records. *Sikes* 187:3-19; Pl.Ex. 15, ¶¶ 22, 26; *Wright* 116:13-22. Instead, she was asked to fill out the Work Clearance Form.

Bryk returned the form—filled out by her primary care physician, Dr. Ashok Bhat—to SJH's Employee Health Department the following day. *Bhat* 22:8-22; Pl.Exs. 32, 33**.** The form stated that Bryk needed use of an "Assistive Device for Gait Dysfunction Following [Right] Total Hip Arthroplasty," specified the use of a cane as medical equipment, and indicated the need was a "permanent restriction." Pl.Ex. 33. Sikes, SJH's human resources manager, acknowledged that she understood Bryk's Work Clearance Form to be "a request to use the cane as an accommodation" under the ADA. *Sikes* 183:8-185:18, 213:9-16**.** On October 21, 2011, Bryk was advised by an SJH Employee Health nurse that her cane could not be accommodated in the BHU. Pl.Ex. 15, ¶ 23; Pl.Ex. 32 p.000319; Pl.Ex. 31 p.3**.**

**Basis for Wright's Decision.** "Based on the nature of the illnesses suffered by the patient population with whom Ms. Bryk worked, Ms. Wright determined that it was unsafe for Ms. Bryk, her Team Members, and for patients to allow the accommodation of the use of a cane, where the cane could be potentially used as a weapon." Pl.Ex.31 p.3; *see also* Pl.Ex.

32 p.00319; *Wright* 134:21-135:15.[8]  Admittedly, Wright's decision that Bryk's cane presented an impermissible danger was not based on any individualized assessment of Bryk's cane use and/or her ability to safely use her cane. *Wright* 131:7-12, 135:16-136:3, 179:12-179:20; *McGee* 52:21-53:8;  *see also* Pls. Ex. 39, No. 1-5. The denial was also not based on any written policy prohibiting the use of canes or other assistive mobility devices by BHU employees: there was and is no such policy. *Wright* 135:16-136:3; *Ryder* 81:13-81:16, 82:13-16; *Teeuwen*, 79:2-79:10. Wright did not consult with SJH's certified risk managers, also RNs, who are employed by the hospital to identify risk issues and recommend risk mitigation. *Villareal* 12:12-13:3; 36:1-39:24. Rather, Wright and other administrators with whom she consulted determined, "[b]ased on their *knowledge and experience* . . . that having a cane on the Unit would pose a safety threat to patients and staff."   Pls. Ex. 39, No. 1-7 (emphasis added).[9]

**Bryk's Termination:** Bryk was not permitted to return to work with a cane and was advised that she had 30 days to find another Baycare job or she would be terminated. *Sikes* 163:11-164:7; 222:20-223:20; Pl.Exs. 15, ¶ 23, 25; Pl.Ex. 31; Pl.Ex. 32. Bryk was not hired for any position she applied for, and was terminated in late 2011. Pl.Ex. 15, ¶ 30.

## II.   LEGAL STANDARD

The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of

---

[8] Wright's decision was purportedly made following discussions with other managers involved in the investigation of Bryk's policy violations: Gail Ryder, Vice President for Behavioral Health; and Patricia Donnolly, Vice-President, Patient Care Services, Patricia Teeuwen, Director of Team Resources, Krista Sikes, Manager of Team Member Relations; and Kevin McGee, Director of Acute Care Services in Nursing for the BHU. *Wright* 83:21-84:3, 137:2-138:24.

[9] Wright was unaware of any concern that Bryk could not physically perform her job functions with a cane, Wright 160:1-4, and no such concerns were ever communicated to Bryk.

material fact. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); *see also Harty v. City of Sanford*, No. 11-CV-1041-ORL-31, 2012 WL 3243282, at *2 (M.D. Fla. Aug. 8, 2012). In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex,* 477 U.S. at 323.

### III.  SJH'S REFUSAL TO PERMIT BRYK'S CONTINUED USE OF A CANE CONSITUTES A FAILURE TO ACCOMMODATE.[10]

"[A]n employer's failure to reasonably accommodate a disabled individual *itself* constitutes discrimination under the ADA, so long as that individual is 'otherwise qualified,' and unless the employer can show undue hardship." *Holly v. Clairson Indus.*, 492 F.3d 1247, 1256 (11th Cir. 2007); *see also Brown v. Lassiter-Ware, Inc*., No. 11-CV-1074, 2013 WL 4456546, at *11 (M.D. Fla. Aug. 16, 2013). To prevail on its failure to accommodate claim, EEOC must demonstrate that Bryk was: (1) disabled; (2) a qualified individual; and (3) discriminated against by way of SJH's failure to make a reasonable accommodation. *McKane v. UBS Fin. Servs., Inc.*, 363 F. App'x 679, 681 (11th Cir. 2010); *see also Brown*, 2013 WL 4456546, *11.

#### A. Bryk Was Disabled Within the Meaning of the ADA.

An individual is disabled under the ADA, as amended, if she: (1) has a physical or mental impairment; that (2) substantially limits one or more major life activities. 42 U.S.C. §

---

[10] The ADA was amended by the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA"). The ADAAA applies to conduct occurring after January 1, 2009, the effective date of the amendment. *See Fikes v. Wal-Mart, Inc*., 322 F. App'x. 882, 883 n.1 (11th Cir. 2009). In enacting the ADAAA, Congress intended to "reinstat[e] a broad scope of protection to be available under the ADA," and overrule caselaw which had "eliminate[ed] protection for many individuals whom Congress intended to protect." ADA Amendments Act of 2008, Pub. L. No. 110–325, 122 Stat 3553 (2008) (codified as amended in scattered sections of 42 U.S.C. §_). Because the failure to accommodate in this case took place in 2011, the ADAAA, as well as recent EEOC regulations, 29 C.F.R. § 1630 (2011), apply.

12102(1)(A). One of Congress' purposes in amending the ADA was to "convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014).[11]

A physical impairment includes "any physiological disorder or condition . . . affecting one or more body systems, such as [the] musculoskeletal [system]." 29 C.F.R. § 1630.2(h)(1). Major life activities include general life activities (such as walking) and bodily functions (such as musculoskeletal system operation). *See* 42 U.S.C. § 12102(2)(A); 29 C.F.R. § 1630.2(i)(1)(ii). An impairment substantially limits a major life activity if it restricts the duration, manner, or condition under which an individual can perform the activity as compared to the ability of the average person in the general population. 29 C.F.R. § 1630.2(j)(1).

Bryk's spinal stenosis substantially limited the operation of her musculoskeletal system and the duration and manner of her ability to walk since as early as 2006, when she began suffering pain symptoms, and undoubtedly since 2009, when she began requiring a cane to walk even short distances. Bryk's medical records, independently and as explained by Dr. John Merritt, demonstrate that Bryk suffered from inoperable and "severe lumbar spinal stenosis . . .  as well as other diagnoses that affect her musculo-skeletal systems." Pl.Ex. 17 pp.7-8. Bryk's ability to walk has been substantially impaired by stenosis, and the pain caused by it while she walks, since no later than 2009. *Id.* at 7-8; *Bryk* 28:6-12, 43:8-16;

---

[11]  Rather, the amendments "promulgate a more liberal standard of the term 'disabled,' making it significantly easier for a plaintiff to show disability." *Barlow v. Walgreen Co.*, No. 11-cv-71, 2012 WL 868807, at *4 (M.D. Fla. Mar. 14, 2012), *citing* 29 C.F.R. § 1630.1(c)(4). Thus, "[t]he primary object of attention in cases brought under the ADA should be whether entities covered by the ADA have complied with their obligations," not whether the employee was disabled. *Mazzeo*, 746 F.3d at 1269.

51:8-52:5. Without her cane, Bryk's short- (and long-) distance walking was impaired, because "the pain was so intense [she] would have to stop" and wait for the pain to subside before she could continue walking. *Bryk* 88:21-90:15; 91:6-17. Even SJH employees noticed how Bryk's walking was substantially impaired, since she visibly limped and had substantial difficulty, and was in "great distress," even when walking short distances without a cane.[12] Bryk's spinal stenosis is and has been a physiological condition affecting her musculoskeletal system and is therefore a "physical impairment." *See* 29 C.F.R. § 1630.2(h)(1).[13] Additionally, Bryk's spinal stenosis substantially limited the duration and manner of Bryk's ability to walk since no later than 2009.

Because: (1) Bryk suffered from spinal stenosis, a physical impairment; and (2) her stenosis substantially impaired the operation of her musculoskeletal system and her ability to walk (a major life activity), Bryk is an individual with a disability under the ADA. *See Mazzeo*, 746 F.3d at 1269-1270; *see also Barlow v. Walgreen Co.*, No. 11-cv-71, 2012 WL 868807, at *4-5 (M.D. Fla. Mar. 14, 2012); *Cohen v. CHLN, Inc.*, No. 10-00514, 2011 WL 2713737, at *6-8 (E.D. Pa. July 13, 2011).

### B.    Bryk is a "Qualified Individual."

A "qualified individual" is "an individual who, with or without reasonable

---

[12] The fact that Bryk was able to walk and perform her job tasks *with a cane* is not relevant since "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as . . . mobility devices." 42 U.S.C. § 12102(4)(E).

[13] SJH may suggest that EEOC and Bryk have inconsistently identified Bryk's disabilities, or that EEOC claims pain as Bryk's disability. But the record reflects that Bryk's disability has always been identified as spinal stenosis, and not solely pain. *See* DE #1, ¶¶ 2, 11, 15; Pl. Exs. 35-37. As explained by Dr. Merritt, lower back pain is one symptom of spinal stenosis, but it is the stenosis (and the pain it causes) that substantially limits her ability to walk, and not a generalized complaint of pain on its own. *See* Pl.Ex. 17 p.6. In Bryk's case, although she began having symptoms of spinal stenosis since 2006, her diagnosis was complicated and delayed because of Bryk's other medical conditions (localized hip pain, knee pain) that often present with symptoms similar to those of spinal stenosis, and which were treated by other methods. *See id.* p.7.

accommodation, can perform the essential functions of the employment position." 42 U.S.C. § 12111(8); *Holly*, 492 F.3d at 1256. A disabled individual is not qualified if she cannot *safely* perform the essential functions of her position. *See* 42 U.S.C. § 12111(3); *Pinckney v. Potter*, 186 F. App'x 919, 925 (11th Cir. 2006). In the Eleventh Circuit, whether an employee can safely perform the essential functions of her position is analyzed using the direct threat analytical framework. *See Lowe v. Alabama Power Co.*, 244 F.3d 1305, 1306, 1308-09 (11th Cir. 2001); *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835-36 (11th Cir. 1998); *Haynes v. City of Montgomery*, No. 06CV1093, 2008 WL 4495711, at \*3-5 (M.D. Ala. Oct. 6, 2008); 29 C.F.R. § 1630.2 (r) (direct threat determination turns on employee's "ability to safely perform the essential functions of the job").[14]

In most other jurisdictions, the burden to prove a direct threat exists is on the employer. *See e.g., See Jarvis v. Potter*, 500 F.3d 1113, 1122 (10th Cir. 2007; *Hutton v. Elf Atochem N. Am., Inc.,* 273 F.3d 884, 893 (9th Cir. 2001); *E.E.O.C. v. Wal-Mart Stores, Inc.,* 477 F.3d 561, 571-72 (8th Cir. 2007); *Branham v. Snow*, 392 F.3d 896, 906 (7th Cir. 2004). The Eleventh Circuit, however, has stated that the employee bears the burden of

---

[14] *See also see also Sarsycki v. United Parcel Serv.*, 862 F. Supp. 336, 341 (W.D. Okla. 1994) ("To invoke safety concerns . . . an employer must show that the individual with a disability poses 'a direct threat to the health or safety of other individuals in the workplace.'"); *Butler v. Louisiana Dep't of Pub. Safety & Corr.*, No. 12-CV-00420, 2013 WL 2407567, at \*6-7 (M.D. La. May 29, 2013). The direct threat framework is also applied where, as here, an employee's requested accommodation presents the putative safety risk, *see E.E.O.C. v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 571-72 (8th Cir. 2010). Thus, the direct threat framework, not a reasonableness analysis, applies when the safety of a requested accommodation is at issue. *See Buskirk v. Apollo Metals*, 307 F.3d 160, 168 (3d Cir. 2002) ("[A]n employer is not required to provide a reasonable accommodation if it . . . would pose a 'direct threat' to the safety of the employee or others."); *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73 (2002).

demonstrating that she is not a direct threat. *See Moses v. Am. Nonwovens, Inc.,* 97 F.3d 446, 447 (11th Cir. 1996) ("The employee retains at all times the burden of persuading the jury either that [s]he was not a direct threat or that reasonable accommodations were available.") Whoever bears the direct threat burden in this case, when viewed in the light most favorable to SJH, the undisputed record evidence demonstrates that Bryk's use of a cane did not constitute a direct threat because it did not pose a significant risk of substantial harm to the health or safety of the individual or others.

### 1. Bryk's Cane Did Not Pose a Significant Risk of Substantial Harm to the Health or Safety of the Individual or Others.

The ADA defines "direct threat" as "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." 42 U.S.C. § 12111(3); *see also* 29 C.F.R. § 1630.2 (r); *Pinckney v. Potter*, 186 F. App'x 919, 925 (11th Cir. 2006). The key inquiry for the direct threat analysis is not "whether a risk exists, but whether it is significant." *Bragdon v. Abbott*, 524 U.S. 624, 649 (1998); *see also Onishea v. Hopper*, 171 F.3d 1289, 1297 (11th Cir. 1999) (en banc); 29 C.F.R. § 1630.2(r). Relevant to this consideration are the: (1) duration of the risk; (2) nature and severity of the potential harm; (3) likelihood that the potential harm will occur; and (4) imminence of the potential harm. 29 C.F.R. § 1630.2(r). Moreover, the assessment of direct threat is based on the evidence before the employer *at the time* the relevant decision was made—*post hoc* evidence does not suffice. *See Bragdon,* 524 U.S. at 649-55; *Fahey v. Twin City Fan Companies, Ltd.*, 994 F. Supp. 2d 1064, 1074-75 (D.S.D. 2014) ("Indeed, Steffes admitted that she has never spoken to a doctor or read any literature regarding the limitations monocular vision imposes on the operation of a forklift. . . . The only information Twin City

Fan had at the time it made its decision to rescind the offer was the fact that Fahey was blind in his right eye. Because of its failure to make the requisite individualized inquiry, Twin City Fan's ultimate decision to rescind the offer could have only been based on prejudices, stereotypes, or unfounded generalizations."). An employer's determination that an employee constitutes a significant risk must be based on "an individualized assessment" that relies on "the best available objective evidence." 29 C.F.R. § 1630.2(r); *see also Tamara v. El Camino Hosp.*, 964 F. Supp. 2d 1077, 1086 (N.D. Cal. 2013) ("[A] hospital cannot make a direct threat determination based on speculation or generalization."). Based on the consideration of these factors, Bryk cane was indisputably not a direct threat.

### a.   The Duration of the Risk.

Bryk worked on the day shift, 7am-3pm, five days a week, when patients spent much of the day in group therapy and/or activity sessions. While Bryk would have routinely interacted with patients, the duration of  patient "exposure" to Bryk's cane would have been no longer than patient exposure to a variety of BHU permitted items—including  walkers, mops, brooms, pens, food trays, plastic utensils and razors—that were as, if not more, harmful and likely to be used as weapons. *See EEOC v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 572 (8th Cir. 2007) (employer failed to explain how employee, using a wheelchair or other device, poses any more of a threat than customers who shop using such devices).

### b.   The Nature and Severity of the Potential Harm.

The potential harm from a patient taking Bryk's cane and using it as a weapon is no greater, and likely less, than the harm resulting from: (1) a patient taking his own cane—the

use of which SJH inpatient psychiatric policies allowed[15]—and using it as a weapon; (2) a patient using a walker—which SJH managers acknowledge was regularly permitted in the BHU—and using it as a weapon; (3) a patient taking cane-like objects (mops and brooms)—which were used in the BHU in the vicinity of patients—and using it as a weapon; or (4) a patient taking other permitted objects (pens and razors) and using them as weapons. *See*, *e.g.,* Pl.Ex. 18 p.8 ("[B]rooms and mops can cause as much harm as canes.").[16] These comparable or greater permissible harms indicate that the nature and severity from the cane's use as a weapon was insignificant. *See Wal-Mart Stores, Inc.*, 477 F.3d at 572.[17]

### c.   There Was Little Likelihood or Imminence of Potential Harm.

#### 1) Objective Evidence

There was very little likelihood that Bryk's cane would be taken from her and used as a weapon. This is borne out by the paucity of Code Grey Incident reports involving objects used as weapons, and the lack of *any* report involving objects taken from staff members and used as weapons, during the three years preceding Bryk's termination. Further, the likelihood of a patient taking Bryk's cane and using it as a weapon is far lower than the

---

[15] As noted *supra*, SJH managers have testified that, in practice, patients would have not have been allowed the use of canes. Nevertheless, the creation and continued existence of policies that explicitly permitted, or implicitly contemplated, the use of canes by patients is significant whether or not SJH employees complied with those policies. *Cf. Smith v. S. Union Cmty. Coll.*, No. 308-CV-414, 2009 WL 2197371, at *4 (M.D. Ala. July 23, 2009) (noting that an employer's claim that it had an "unwritten policy of not following its written policy" may be pretextual). Further, it is beyond dispute that Title II of the ADA secures a patient's right to reasonable accommodations in the hospital setting. *Tamara ,* 964 F. Supp. 2d at 1086.

[16] The Court denied EEOC access to information concerning actual patient use of mobility devices in discovery. *See* D.E. # 36 at 3-8; D.E. # 68 at 2; D.E. # 79 at 2.

[17] Moreover, SJH failed to make any individualized assessment of potential harm from *Bryk's* cane and instead relied on assumption for the determination that her cane would be significantly harmful if taken and used as a weapon. Bryk was never even asked what her cane was made of or what it weighed. This constitutes an inadequate individualized assessment. *See, e.g., Tamara*, 964 F. Supp. 2d at 1086 (finding that employer's failure to investigate risk presented by service-dog's specific collar constituted inadequate individualized assessment).

likelihood that a patient might take his own cane or other permitted mobility device—the use of which SJH policies *allowed*—and use it as a weapon. *See* Pl.Ex. 18 pp.7-8.

The likelihood of a patient taking Bryk's cane and using it as a weapon is also lower than that of patient taking a mop or a cane used by SJH maintenance personnel:  brooms and mops, in the untrained hands of maintenance personnel, are as likely, if not more likely, to be used as a weapon than a cane used by a trained and experienced psychiatric nurse with over two decades of experience in the inpatient setting. *See* Pl.Ex. 18 p.8; *Wal-Mart*, 477 F.3d at 572 (noting employer failed to explain how employee, using a wheelchair posed more of a threat than customers using similar devices).

There was no objective evidence for the determination that a cane was likely to be taken The SJH administrators who determined that Bryk's cane presented an unacceptable safety risk have acknowledged that they relied solely on their subjective "knowledge and experience" that a psychiatric employee should never be permitted to use a cane because a patient *might* take the cane and hit someone. This is insufficient. *See Lowe*, 244 F.3d at 1308-9 (finding that doctor's personal-experience-based direct threat determination did not constitute sufficient objective evidence). SJH's expert, Dr. Debra Barnett, provides no meaningful evidence regarding cane weapon-use risk: she simply does not recall patients or staff using canes in inpatient units in which she worked. *See generally* Pl.Ex. 14.[18]

2) Individualized Assessment

Bryk also cannot be deemed a direct threat because SJH admittedly conducted no

---

[18] Moreover, she acknowledges that no facility at which she worked explicitly banned employee or patient canes, and can recall only one instance of a patient being denied the use of a cane. *See generally* Pl.Ex. 19; *Barnett*; *see also Barnett* 34:6-20.

"individualized assessment" of the likelihood that *her* cane would be taken from *her* and used as a weapon. *See Lowe*, 244 F.3d at 1308 (no evidence that the employer determined whether plaintiff posed a safety risk); *Haynes*, 2008 WL 4495711, at *5 (upholding ADA verdict for plaintiff where evidence indicated city employer *believed* plaintiff *could* pose a safety risk to fellow firefighters and the public; such belief, even if held in good faith, insufficiently objective and not based on required individualized assessment of plaintiff's ability to safely perform job's essential functions). The SJH administrators who determined that Bryk's cane presented an unacceptable safety risk have acknowledged that they never considered or determined whether Bryk, a trained and experienced veteran nurse of 21 years in the BHU, was able to use her cane in a way that would mitigate the risk of it being taken and used as a weapon. *See Lowe*, 244 F.3d at 1308 ("The magistrate judge went on to explain that reliance on [a doctor's] restrictions was reasonable, in part, because the restrictions were based on [a doctor's] experience with other amputees. The magistrate judge did not determine whether [plaintiff] *actually* posed a direct threat to the safety of others")*; Rojek v. Catholic Charities of Jackson, Inc.,* No. 08-14492, 2010 WL 2232240, at *13 (E.D. Mich. May 27, 2010) (denying employer's motion for summary judgment where there were "questions about whether the strategies and techniques [plaintiff] has developed over the course of years of practice as a blind social worker would enable her to sense danger in escalating situations and navigate out of a home"); *See also Fahey*, 994 F. Supp. 2d at 1079 ("There is a complete lack of evidence that Twin City Fan made any good faith effort to accommodate Fahey. Steffes testified that she made the determination that Fahey could not be accommodated after discussions with internal employees. Steffes made this determination, however, without any

information—from Dr. Edinger or from any medical or other relevant literature—about Fahey's specific limitations or how those limitations would affect his ability to perform the parts expediter position. Nor did Steffes discuss Fahey's limitations with Fahey. Steffes's decision that Fahey could not be accommodated, therefore, necessarily was based on stereotypes, generalizations, and prejudices.").

SJH also failed to take into account Bryk's undisputed use of her cane in the BHU for some period without it being taken and used as a weapon. This period of safe use further suggests the low likelihood of such an event. *See Fahey,* 994 F. Supp. 2d at 1079; *Anderson v. Little League Baseball*, Inc., 794 F. Supp. 342, 345 (D. Ariz. 1992) (finding Little League coach's wheelchair did not present a direct threat and weighing heavily coach's use of wheelchair without incident).[19]

SJH also failed to assess: (1) the propensity for violence and object-use violence of the patients in Bryk's unit and shift—2 North B unit patients were less volatile and aggressive, and there was a paucity of object-violence incidents for 2 North B and particularly for the 7 a.m.-3 p.m. shift[20]; and (2) whether certain aspects of Bryk's cane—including its hand strap—made it particularly unlikely to be taken and used as a weapon. This amounts to an insufficient individualized assessment. *See Tamara*, 964 F. Supp. at 1086.

Thus, EEOC is entitled to summary judgment that the putative use-as-weapon danger of Bryk's cane did not render her a direct threat and, therefore, unqualified. *See Haynes*, 2008 WL 4495711, at * 4-5  (denying motion for judgment as a matter of law and finding

---

[19]   SJH will likely note, correctly, that an employer need not, as a matter of law, continue to provide an unreasonable accommodation. But an employer's history of permitting an accommodation weighs heavily against a finding that the accommodation was significantly *unsafe*.

[20] As noted *supra*, patients were engaged in therapy and other group activities during this shift.

that plaintiff had presented sufficient evidence for jury to find that plaintiff was not a direct threat where employer did not conduct individualized assessment).

### 2.   The Court Should Require SJH to Prove Direct Threat.

Bryk has demonstrated above that her use of a cane did not constitute a direct threat under prevailing Eleventh Circuit case law and, as a result, Bryk was a "qualified individual with a disability." *See Moses v. Am. Nonwovens, Inc.,* 97 F.3d 446, 447 (11th Cir. 1996) ("The employee retains at all times the burden of persuading the jury either that [s]he was not a direct threat or that reasonable accommodations were available." (citing *Benson v. Northwest Airlines, Inc.,* 62 F.3d 1108, 1112 (8th Cir.1995)). The Court, however, should not apply the broad language of *Moses* that puts the burden on EEOC to demonstrate that Bryk was not a direct threat because it is: (1) contrary to the statutory language and unsupported by other authority; and (2) particularly ill-suited for the facts of this case, where the safety of an *accommodation*, not a disability, is at issue.

First, *Moses's* placement of the burden of disproving a statutory "defense," *see* 42 U.S.C. § 12113, on the plaintiff is inconsistent with longstanding Supreme Court and Eleventh Circuit precedent holding that defendants bear the burden of proving defenses. *See Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 91-95 (2008); *Singleton v. Dep't of Corr.,* 277 F. App'x 921, 923 (11th Cir. 2008). Second, the single authority *Moses* cited for the proposition that the employee bears the burden on direct threat, *Benson*, did not analyze (or mention) direct threat. *See Benson*, 62 F.3d at 1112. But even if *Moses* remains good law generally, the facts of this case—in particular, that the putative danger comes from Bryk's accommodation as opposed to her disability—weigh strongly in favor of placing the burden

on SJH.[21]  In *Moses* and similar cases, the employee's disability itself (in *Moses,* epilepsy) presents the putative risk. In that context, the employee is likely to be best informed about her medical condition—its severity, its presentation, the risk of infecting others—and therefore logically bears the burden. *See Browzin v. Catholic Univ. of Am.*, 527 F.2d 843, 849 (D.C. Cir. 1975) ("[O]rdinarily a litigant does not have the burden of establishing facts peculiarly within the knowledge of the opposing party."). Here, Bryk herself is not at issue; it is potential that her  cane would be taken by a patient and used as a weapon—and how that compares to acceptable risk in the BHU. SJH is in a far better position than Bryk to speak first on such issues.[22] Accordingly, because the *accommodation* is alleged to cause a direct threat, the burden of proving the same must be borne by the employer.

### 3.   There is No Evidence – Beyond Assumption and Stereotype – that Bryk Was Physically Unable to Perform the Essential Functions of the CN II Position.

To the extent that SJH argues that—independent of any weapon-use danger—Bryk was unable to physically perform the essential functions of the CN II position with a cane, the record evidence conclusively demonstrates otherwise. As Bryk's declaration makes clear, she was able to perform all of the essential functions of the Clinical Nurse II position. *See*

---

[21]   Other courts have recognized that the allocation of the direct threat burden may be fact-dependent. *See, e.g., Rizzo v. Children's World Learning Centers, Inc.*, 173 F.3d 254, 258-60 (5th Cir. 1999) *on reh'g en banc,* 213 F.3d 209 (5th Cir. 2000); *Borgialli v. Thunder Basin Coal Co.,* 235 F.3d 1284, 1293-94 (10th Cir. 2000).

[22]   Indeed, placing the burden on SJH entirely consistent with the ADA's placement on the employer of the burden of demonstrating that an accommodation would be an undue hardship on its particular business. *See Holly*, 492 F.3d 1247 at  1262; *Willis v. Conopco, Inc.*, 108 F.3d 282, 286 (11th Cir. 1997) ("Undue hardship is an affirmative defense to be pled and proven by an ADA defendant."). Undue hardship turns on "whether an accommodation causes a 'hardship' on the particular employer that is undue." Willis, 108 F.3d at  286 ; *see also Barth v. Gelb,* 2 F.3d 1180, 1187 (D.C. Cir. 1993*)* ("[T]he undue hardship inquiry focuses on the hardships imposed by the plaintiff's preferred accommodation in the context of the particular agency's operations.")  The placement of the burden on the employer to demonstrate that proposed accommodations will pose an undue hardship on its particular business is logical in light of the employer's inevitably superior knowledge of its own business.

Pl.Ex. 15, ¶ 29; *see also* Pl.Ex. 17, p.8. There is no contemporaneous evidence that a concern ever existed as to Bryk's physical ability to perform her job—Bryk's managers never put any such concerns in her performance evaluations, addressed such concerns with Bryk, or referred Bryk for a physical evaluation. There are no facts about Bryk's ability to perform beyond certain SJH managers' recently voiced stereotypical and speculative assumptions that certain functions cannot be performed with a cane. These assumptions do not create a question of fact as to whether Bryk was physically able to perform the CNII essential functions. *See School Board of Nassau County v. Arline,* 480 U.S. 273, 284 (1987).

**C.      SJH Failed to Provide Bryk with the Reasonable Accommodation of the Continued Use of Her Cane.**

"An employer unlawfully discriminates against a qualified individual with a disability when the employer fails to provide 'reasonable accommodations' for the disability—unless doing so would impose undue hardship on the employer." *Lucas v. W.W. Grainger, Inc.,* 257 F.3d 1249, 1255 (11th Cir. 2001); 42 U.S.C. § 12112(b)(5)(A). But "the duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made." *Gaston v. Bellingrath Gardens & Homes, Inc.,* 167 F.3d 1361, 1363 (11th Cir. 1999). EEOC is entitled to summary judgment because Bryk requested use of her cane as an accommodation, her cane was a reasonable accommodation, and her cane would not impose an undue hardship on SJH.

**1.   Bryk Requested a Reasonable Accommodation for Her Obvious and Implicitly Disclosed Medical Condition.**

To adequately request an accommodation under the ADA, an employee is not required to provide a medical diagnosis. Rather, "for a demand to be specific enough to

trigger the duty to provide a reasonable accommodation, the defendant must have enough information to know of both the disability and desire for an accommodation, or circumstances must at least be sufficient to cause a reasonable [employer] to make appropriate inquiries about the possible need for an accommodation." *U.S. v. Hialeah Hous. Auth.,* 418 F. App'x 872, 876 (11th Cir. 2011); *Gaston,* 167 F.3d at 1364.

In this case, the Court is not asked to assess whether, cobbling random events or ambiguous conversations together, SJH's duty to accommodate was triggered. This is because the undisputed facts establish that Krista Sikes, SJH's human resource manager who was knowledgeable about the ADA and SJH's accommodation policy, *admits* that Bryk's completed Work Clearance Form was a request for a reasonable accommodation under the ADA. Furthermore, SJH went through the process of determining whether Bryk could be accommodated and decided she could not. Notably, SJH did *not* fail to make a determination because they lacked Bryk's specific medical diagnosis and did not deny her requested accommodation because she was not "disabled;" indeed, it would have been unreasonable to do so because SJH's accommodation policy contemplates having the employee sign a release for medical records and the review of those records to determine "the nature, reasons for and possible alternatives to the requested accommodation." Pl.Ex.25 p.000485-488.

To the extent that SJH *now* argues it did not have enough information about Bryk's disability, it is disingenuous. Wright saw Bryk use her cane at work and SJH managers testified that Bryk's difficulty walking was obvious, and that she had an obvious limp. *See Hodgetts v. Venice*, 794 F. Supp. 2d 1265, 1274-75 (M.D. Fla. 2011)("From the record it appears that Mr. Hodgetts had obvious difficulty walking, requiring him to wear a knee brace

and use a cane for even short distances"). In the September/October 2011 timeframe, Bryk explained to Sikes that she needed the cane to ambulate; Sikes believed Bryk's medical condition was linked to her 2009 hip surgery. *Sikes* 140:17-23; 186:9-23. These facts establish that SJH understood what Bryk requested (continued use of a cane) and why she requested it. They are sufficient as a matter of law.

### 2. Bryk's Cane Was a *Reasonable* Accommodation and Not an Undue Hardship.

A reasonable accommodation is one that: (1) allows an employee to perform the essential functions of her job; and (2) on its face, is not overly costly for the employer. *See Earl v. Mervyns, Inc.,* 207 F.3d 1361, 1365 (11th Cir. 2000); *Alumni Cruises, LLC v. Carnival Corp.,* 987 F. Supp. 2d 1290, 1308 (S.D. Fla. 2013). "[W]hat is reasonable for each individual employer is a highly fact-specific inquiry that will vary depending on the circumstances and necessities of each employment situation." *Holbrook v. City of Alpharetta,* 112 F.3d 1522, 1527 (11th Cir.1997); *see also Terrell v. USAir,* 132 F.3d 621, 626 (11th Cir. 1998) (reasonableness depends on the circumstances).

Dr. Merritt's unrebutted expert report indicates that Bryk's cane allowed her to physically perform her job functions. To the extent SJH attempts to avoid analysis of its safety-based rationale under the direct threat framework by disingenuously couching it in terms of "reasonableness," there is no support for SJH's argument in the Eleventh Circuit. To the contrary, such safety issues are, as noted *supra*, analyzed under the direct threat framework. *See Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73 (2002); *see also Buskirk v. Apollo Metals*, 307 F.3d 160, 168 (3d Cir. 2002). Moreover, SJH was not asked to create a new position for Bryk, *see Terrell*, 132 F.3d at 626, bump another employee from a position,

contravene a seniority system or the requirements of collective bargaining, *see, e.g., U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002), make indefinite workplace changes, *see Wood v. Green*, 323 F.3d 1309, 1312 (11th Cir. 2003), or reallocate job duties to change the functions of the job. *Earl v. Mervyns, Inc.,* 207 F.3d 1361, 1367 (11th Cir. 2000). This is particularly true where Bryk was extensively trained by SJH to meet the *very* safety issue at issue – patient aggression – and failed to consider that training and her extensive experience working with behavioral health patients.

Finally, undue hardship is an affirmative defense to be pled and proven by an ADA defendant. *Willis v. Conopco, Inc.*, 108 F.3d 282, 286 (11th Cir. 1997). Undue hardship turns on the cost to the specific employer of providing the requested accommodation. *See* 29 C.F.R. § 1630.2(p)(1) (defining undue hardship as "significant difficulty or expense incurred by a covered entity"). The record is devoid of facts supporting the idea that Bryk's use of a cane would harm "the operation of the business," as SJH suggests. The continued use of cane would not have been an undue hardship for SJH because it would have cost SJH nothing and not affected the operation of the hospital, and specifically the BHU, in any respect.

## IV.    CONCLUSION

For the reasons set forth above, the Court should grant EEOC's Partial Motion for Summary Judgment as to SJH's failure to accommodate Bryk by allowing her to continue to use her cane in the BHU.

Dated: January 9, 2015

s/Daniel Lewis Seltzer
DANIEL LEWIS SELTZER
Trial Attorney
Massachusetts Bar No. 680997

s/Ana C. Martinez
ANA CONSUELO MARTINEZ
Trial Attorney
New York Bar No. 4935607
KIMBERLY A. CRUZ
Supervisory Trial Attorney
Florida Bar No. 153729

U.S. Equal Employment Opportunity
Commission
Miami District Office
Miami Tower
100 S.E. 2nd Street, Suite 1500
Miami, Florida 33131
Tel: (305) 808-1779
Fax: (305) 808-1835
ana.martinez@eeoc.gov
daniel.seltzer@eeoc.gov
kimberly.cruz@eeoc.gov
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2015, I served the foregoing document with the Clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to:

Thomas M. Gonzalez
Erin G. Jackson
Thompson, Sizemore, Gonzalez, & Hearing, P.A.
201 North Franklin Street, Suite 1600
Tampa, Florida 33602
Tel: (813) 273-0050
Fax: (813) 273-0072
ejackson@tsghlaw.com
*Attorneys for Defendant*

s/ Daniel Lewis Seltzer
DANIEL LEWIS SELTZER